UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE CHILDREN'S HOSPITAL,<br>CORPORATION D/B/A BOSTON<br>CHILDREN'S HOSPITAL,<br><br>        Plaintiff,<br><br>   v.<br><br>ISIN CAKIR,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No.: 15-cv-13281<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                           **September 12, 2017**

### I.     Introduction

Plaintiff Children's Hospital Corporation ("Children's Hospital") has filed this action against Defendant Isin Cakir ("Cakir"), alleging that Cakir is in wrongful possession of the data on a laptop computer Cakir used during the course of his employment with Children's Hospital. D. 1. Children's Hospital asserts claims for replevin and conversion under Massachusetts law. Id. Cakir has now filed a motion for summary judgment. D. 53. Children's Hospital filed a cross motion for summary judgment on those same claims. D. 55. For the foregoing reasons, Cakir's motion for summary judgment is DENIED and Children's Hospital's motion for summary judgment is ALLOWED.

### II.    Standard of Review

A moving party is entitled to summary judgment where there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). Material facts are those that carry the potential "to affect

the outcome of the suit under the applicable law." Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). The burden of demonstrating with evidence that there exists no genuine issue of material fact belongs to the moving party. Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rely exclusively upon the allegations or denials in her pleadings. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). Instead, the nonmoving party "must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor." Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). "As a general rule, that requires the production of evidence that is 'significant[ly] probative.'" Id. (alteration in original) (quoting Anderson, 477 U.S. at 249). In conducting this inquiry, the Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

### III.   Procedural History

This civil action is related to Cabi et al. v. Boston Children's Hospital ("Cabi"), an ongoing suit in which Cakir, along with two other plaintiffs, asserts employment discrimination, wrongful termination and retaliation claims against Children's Hospital. Cabi et al. v. Boston Children's Hosp., No. 15-cv-12306-DJC, 2016 WL 593495, at *1 (D. Mass. Feb. 12, 2016). In this case, on September 3, 2015, Children's Hospital brought claims of conversion and replevin against Cakir concerning a laptop and data from that laptop. D. 1. On October 29, 2015, Cakir brought a counterclaim for abuse of process. D. 9. Children's Hospital moved to dismiss the counterclaim and moved for judgment on the pleadings on its counts of conversion and replevin. D. 12. After

briefing and hearing, this Court denied Children's Hospital's motion for judgment on the pleadings on its claims, but allowed Children's Hospital's motion to dismiss Cakir's counterclaim for abuse of process. D. 26.

## IV.     Factual Summary

From October 2010 to June 19, 2014, Cakir was employed as a post-doctoral fellow at Children's Hospital working in a laboratory run by Dr. Umut Ozcan ("Ozcan"). D. 57 ¶ 1, D. 67-1 ¶ 1. On October 6, 2010, Cakir signed a document entitled the Participation Agreement for Persons Using the Funds and Facilities of Children ("Participation Agreement"). D. 57 ¶ 11, D. 67-1 ¶ 11. Children's Hospital had two other policies in place during this period: the Acceptable Use of Computer and Network Resources ("Acceptable Use Policy") and the Policy on Data Management, Retention Availability – Investigator and Staff Obligations ("Data Management Policy"). D. 57 ¶ 12-15; D. 67-1 ¶ 12-15. The "Acceptable Use Policy" states that it covers "[anyone] who uses [Children's Hospital's] Computer Resources and related services or accesses the information stored there" and "[any] hardware or software systems that store, communicate, or can access CHB's electronic information (collective, the 'Computer and Network Resources')." D. 57 ¶ 13; D. 67-1 ¶ 13; D. 59-6 at 1. Under the Acceptable Use Policy, any "[i]nformation stored on or transmitted over CHB's Computer and Network Resources (including email) is the sole and exclusive property of [Children's Hospital]." D. 57 ¶ 13; D. 67-1 ¶ 13; D. 59-6 at 1.

Between July 2013 and June 2014, Cakir used a 13-inch Macbook Air laptop ("the Laptop"), at least in part for work-related activity. D. 57 ¶ 2, D. 67-1 ¶ 2. On July 9, 2013, Serkan Cabi, a post-doctoral fellow in Ozcan's lab sent an email to Mario Salazar, a research assistant in Ozcan's lab responsible for procuring equipment, requesting that Salazar place an order for a 13-inch MacBook Air, among other supplies. D. 57 ¶ 4; ¶ D. 67-1 ¶ 4. Cabi told Salazar that Ozcan

had approved the order. D. 57 ¶ 4, D. 67-1 ¶ 4. According to Cakir, Ozcan represented to Cakir that the Laptop was a gift to thank Cakir for helping with a grant submission. D. 67-1 ¶ 2. Ozcan asked Cakir to make sure that he registered the computer with Children's Hospital. D. 57 ¶ 5, D. 67-1 ¶ 5. The Laptop was paid for by Children's Hospital. D. 57 ¶ 5-8; D. 67-1 ¶ 5-8. After the Laptop was delivered to Cakir, Cakir registered the Laptop with Children's Hospital. D. 57 ¶ 16; D. 67-1 ¶ 16.

In March 2014, Children's Hospital made a "mirror image" of the Laptop, copying the entire contents of the Laptop. D. 53-1 ¶ 1-2; D. 64-1 ¶ 1-2. The parties dispute whether Children's Hospital still has this mirror image. D. 64-1 ¶ 1; D. 73 at 2-3. A few months later, on June 19, 2014, Children's Hospital informed Cakir that he was no longer working in Ozcan's lab. D. 57 ¶ 17; D. 67-1 ¶ 17. On August 7, 2014, Children's Hospital informed Cakir that it owned the Laptop and requested that Cakir return it to Children's Hospital. D. 57 ¶ 18-19, D. 67-1 ¶ 18-19. Cakir, however, did not return the Laptop as requested. D. 57 ¶ 20, D. 67-1 ¶ 20. In August 2014, Cakir provided Children's Hospital with a thumb drive containing at least some of the research data that was on the Laptop; there is a dispute between the parties regarding whether this thumb drive contained all of the research data that was on the Laptop. D. 53-1 ¶ 3; D. 64-1 ¶ 3.

On August 21, 2014, at Children's Hospital's request, Cakir delivered the Laptop to TechFusion, a computer forensic firm, and TechFusion made a copy of the Laptop ("Forensic Image"). D. 57 ¶ 21; D. 67-1 ¶ 21, D. 53-1 ¶ 4, D. 64-1 ¶ 4. Children's Hospital paid TechFusion for this service, although there is a dispute regarding whether Children's Hospital has paid TechFusion in full for this service. D. 57 ¶ 21; D. 67-1 ¶ 21. Cakir and TechFusion entered into

a Non-Disclosure Agreement, whereby TechFusion would not give Children's Hospital the Forensic Image without Cakir's written consent. D. 57 ¶ 22; D. 67-1 ¶ 22.

On October 31, 2014, Children's Hospital sent a letter to Cakir through his then-counsel requesting the return of the Laptop and "all files, hard drives and metadata . . . stored or located on" it. D. 57 ¶ 23; D. 67-1 ¶ 23. Cakir retrieved the Laptop from TechFusion, deleted certain files from it, and then delivered the Laptop to Children's Hospital on November 17, 2014. D. 57 ¶ 24-25; D. 67-1 ¶ 24-25; D. 53-1 ¶ 6; D. 64-1 ¶ 6. Cakir contends that the deleted files were exclusively personal and Children's Hospital contends that the deleted files contained research-related material. D. 53-1 ¶ 11, D. 64-1 ¶ 11. Cakir still has not authorized TechFusion to deliver the Forensic Image to Children's Hospital. D. 57 ¶ 26-27; D. 67-1 ¶ 26-27.

**V.     Analysis**

**A.  Children's Hospital Is Entitled to Summary Judgment on the Conversion Claim**

Conversion involves "the exercise of dominion or control over the personal property of another." Third Nat. Bank of Hampden Cty. v. Cont'l Ins. Co., 388 Mass. 240, 244 (1983). A plaintiff must show that (1) the defendant intentionally and wrongfully exercised control over property owned or possessed by the defendant; (2) the plaintiff was damaged; and (3) if the defendant legitimately gained possession under a good-faith claim of right, the plaintiff's demand for the return of the property was refused. See Evergreen Marine Corp. v. Six Consignments of Frozen Scallops, 4 F.3d 90, 95 (1st Cir. 1993) (citing Magaw v. Beals, 272 Mass. 334 (1930)). Children's Hospital contends that it owns the data on the Laptop and the Laptop itself, and that Cakir wrongfully exercised control over both, causing it damage. Cakir disputes these conclusions, and asserts that the conversion action fails as a matter of law because the data on the Laptop is intangible.

> **i.  There Is No Genuine Dispute of Material Fact Regarding Whether Children's Hospital Owns the Laptop and the Data in the Forensic Image**

Children's Hospital contends that it owns the Laptop because it purchased the Laptop and paid for it. D. 56 at 6; D. 57 ¶ 5-8; D. 67-1 ¶ 5-8. Cakir does not dispute that Children's Hospital paid for the Laptop. However, Cakir contends that Children's Hospital did not own the Laptop because Dr. Ozcan acted as an agent of Children's Hospital and gave the Laptop as a gift to Cakir. D. 67 at 7. Cakir contends that Ozcan's gifting of the Laptop binds Children's Hospital because Ozcan acted with "apparent authority" from Children's Hospital. Id.

Under Massachusetts law, "the principal has liability for the agent's acts toward third parties only if the agent was acting with the actual or apparent authority of the principal in that transaction." Theos & Sons, Inc. v. Mack Trucks, Inc., 431 Mass. 736, 743 (2000). "Apparent authority, is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." Id. (citation omitted). The relevant time for assessing whether the principal's conduct reasonably caused the third person to understand that the principal consented to having the agent act on his behalf is "at the time [the third party] entered the transaction." Id. Additionally, apparent authority is assessed not generally as to the existence of an agency relationship, but specifically with respect to whether the agent had apparent authority to perform a particular task. See Arber v. American Airlines Inc., 345 F.2d 130, 131 (1st Cir. 1965).

Cakir, however, does not point to any conduct by Children's Hospital that occurred before the time that Ozcan delivered the Laptop to Cakir that would lead Cakir to conclude reasonably that Children's Hospital had consented to have Ozcan give the Laptop as a gift on its behalf. Cakir points only his own deposition testimony and that of another postdoctoral researcher in Ozcan's

lab indicating that Ozcan gave performance-based raises to researchers in his lab.  D. 67 at 8.  That fact does not constitute conduct by Children's Hospital, much less conduct that would render it reasonable for Cakir to believe that Children's Hospital had authorized Ozcan to gift him the Laptop on its behalf.  Given that it is undisputed that Children's Hospital purchased the Laptop, there is no genuine dispute of material fact over whether Children's Hospital owns the Laptop.

Because Children's Hospital owns the Laptop, Children's Hospital has also succeeded in showing, without any genuine dispute of material fact, that it owns the data on the Laptop.  The "Acceptable Use Policy" covers "[any] hardware or software systems that store, communicate, or can access CHB's electronic information (collectively, the 'Computer and Network Resources')."  D. 57 ¶ 13; D. 67-1 ¶ 13; D. 59-6 at 1.  Because Children's Hospital owns the Laptop, the Laptop constitutes a part of the "Computer and Network Resources" of the Acceptable Use Policy.  Under that policy, any "[i]nformation stored on or transmitted over CHB's Computer and Network Resources (including email) is the sole and exclusive property of [Children's Hospital] and remains so even when stored on non-CHB equipment and media (such as your personal laptop and/or mobile device)."  D. 57 ¶ 13; D. 67-1 ¶ 13; D. 59-6 at 1.  Thus, any information stored on the Laptop was, under the terms of the Acceptable Use Policy, the "sole and exclusive property" of Children's Hospital.  The data contained in the Forensic Image, by the same logic, is also the property of Children's Hospital, because all of the data contained in the Forensic Image is a copy of the data once stored on the Laptop and remained so when copied to the Forensic Image.

    **ii.**    **There Is Also No Genuine Dispute of Material Fact Regarding Whether Cakir Converted the Laptop and the Forensic Image**

Children's Hospital contends that Cakir converted both the Laptop and the Forensic Image.  D. 56 at 11.  It argues that Cakir converted the Laptop (even though he later returned the Laptop itself to Children's Hospital) because Cakir made "material changes" to the Laptop before

returning it. D. 56 at 11-12. See Jackson v. Innes, 231 Mass. 558, 560 (1919) (finding conversion where the defendant made "material changes" to property before returning it). Cakir does not contest that he made changes to the Laptop before returning it. D. 67 at 11. Cakir instead argues that he did not make material changes to the Laptop but rather only deleted personal data from the Laptop that was of no value to Children's Hospital. Id. He further contends that Children's Hospital expressly assured him that it did not place any value on his personal data. Id. In support of that contention, he points to a chain of emails between his attorney and Children's Hospital's counsel wherein Children's Hospital seeks access to the research-related data on the Laptop, but does not seek access to the personal data. Id. Whether Children's Hospital sought his personal data, however, does not change the conclusion that Children's Hospital owned both the Laptop and all the data on it, including the personal data, and, therefore, that Cakir made material changes to the Laptop by admittedly deleting files.

Children's Hospital next contends that Cakir converted the Forensic Image by refusing to turn the Forensic Image over to Children's Hospital upon request. D. 56 at 12. Cakir contends that it was not possible for him to convert the Forensic Image because, he argues, under Massachusetts law, there can be no conversion of intangible property. See In re TJX Companies Retail Sec. Breach Litigation, 527 F. Supp. 2d 209, 213 (D. Mass. 2007) ("a claim for conversion based on" data stored electronically "likely is not cognizable in Massachusetts"), vacated in part on other grounds, 564 F.3d 489, 499 (1st Cir. 2009) (stating that "[w]hether or not Massachusetts limits conversion claims to tangible property is debatable").

Children's Hospital responds that at least one Massachusetts court has allowed a claim of conversion to proceed based on data stored electronically. See Network Systems Architects Corp. v. Dimitruk, 23 Mass. L. Rptr. 339, 2007 WL 4442349 at *10 (Mass. Sup. Ct. Dec. 6, 2007). In

that case, a former employee allegedly copied electronically stored documents from the employer, deleted them such that the employer could not access them, and used them for the benefit of his new employer. Id. at *1. In holding that the electronically stored documents constituted property that could be the subject of a conversion, the court explained that "[i]n the modern world, computer files hold the same place as physical documents have in the past. If paper documents can be converted, as they no doubt can . . . no reason appears that computer files cannot." Id. at *10; see id. (citing Thryoff v. Nationwide Mut. Ins. Co., 8 N.Y.3d 283, 291-92 (2007) (reasoning that "[c]omputers and digital information are ubiquitous and pervade all aspects of business, financial and personal communication activities. . . . We cannot conceive of any reason in law or logic why this process of virtual creation should be treated any differently from production by pen on paper or quill on parchment"). Just as Cakir would be liable for conversion, as Children's Hospital analogizes, if he had taken a book from Children's Hospital, ripped out pages, and then returned the book, so he is similarly liable for conversion because he took the Laptop from Children's Hospital, deleted data from it, and then returned the Laptop.

Cakir next contends that Children's Hospital cannot succeed in proving its conversion claim because there is a genuine dispute of material fact as to whether Children's Hospital retains a copy of the deleted files. D. 53-1 at 9. Children's Hospital contends that even if it has a copy, it can still succeed in its conversion claim. In support of this proposition, it cites Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760 (1986). In Datacomm, the Supreme Judicial Court ruled that that the defendant had committed conversion where it had obtained an unauthorized copy of a document owned by the plaintiff, turned the document over in litigation and misrepresented that the document was the only copy when in fact the defendant retained another copy, and failed to turn over that copy to the plaintiff. Id. at 774. Thus, Children's

Hospital's retention of a copy of the data alone does not undermine its conversion claim with respect to the Forensic Image.

Finally, Cakir contends that under the Data Management Policy, he was permitted to make a copy of data owned by Children's Hospital, and, therefore, that his creation and retention of the Forensic Image cannot give rise to the wrongful exercise of control over the Laptop and data that is required for Children's Hospital's conversion claim. D. 67 at 13-14. In support of this contention, he cites a portion of the Data Management Policy that provides that departing researchers may make copies of data under certain conditions, including securing permission from institution and ensuring that the institution retains its copy. D. 59-7 at 6. There is no evidence in the record put forth by Cakir to show, as a matter of undisputed fact or otherwise, that these conditions were met. Thus, the Court cannot conclude that there is a disputed issue of fact as to this issue, where Cakir has failed to rebut Children's Hospital's showing with respect to the Cakir's wrongful exercise of control over the Forensic Image and Cakir has failed to show as an undisputed issue of material fact that the Data Management Policy authorized Cakir to create and retain the Forensic Image without allowing Children's Hospital access to it.

### B. Children's Hospital is Also Entitled to Summary Judgment on its Replevin Claim (Count II)

To prevail on a replevin claim, a plaintiff must show that (1) the goods in question were unlawfully taken from their owner's possession or have been unlawfully detained; (2) the owner has a right to possession; and (3) the value of the goods exceeds twenty dollars. See Wilson v. Estate of Arcese, No. 07-cv-01461-MAH, 2007 WL 2429607, at *3 (Mass. Super. Aug. 9, 2007). "[N]ot only must the plaintiff have the right to possession generally, but he must have the right to immediate, exclusive and unqualified possession of the property as against each defendant." Id. (alteration in original) (internal quotation marks and citation omitted). For the same reasons that

Children's Hospital is entitled to summary judgment on the conversion claim, it is similarly entitled to summary judgment on the elements of this claim that the Forensic Image was unlawfully detained and that Children's Hospital has a right to possess it. As for the monetary requirement, it is undisputed that the Children's Hospital paid TechFusion at least $6,671.88 for the Forensic Image of the Laptop, D. 59-10 at 3, indicating, at least by one measure, that the value of the Forensic Image exceeds twenty dollars.

Children's Hospital, moreover, has not waived this claim. Cakir contends that Children's Hospital waived this replevin claim by stating at one point that it did not seek to prohibit Cakir from retaining a copy of the Forensic Image, provided he released a copy of the Forensic Image to Children's Hospital. D. 53-1 at 10. Children's Hospital's choice not to prohibit Cakir from retaining a copy, however, does not indicate that it waived its replevin claim for the taking and retention of the original Laptop or its data or the detention of the Forensic Image. See Advance Power Sys., Inc. v. Hi-Tech Sys., Inc., 801 F. Supp. 1450, 1458 (E.D. Pa. 1992) (finding no waiver of replevin counterclaim with defendant's delay in pursuing claim after alleged theft where property was still in plaintiff's possession).

## VI. Conclusion

For the aforementioned reasons, the Court DENIES Cakir's motion for summary judgment, D. 53, and ALLOWS Children's Hospital's motion for summary judgment. D. 55.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge